# Exhibit A



# IN THE GRAND COURT OF THE CAYMAN ISLANDS
# FINANCIAL SERVICES DIVISION

### CAUSE NO. FSD 120 OF 2020 (ASCJ)

## IN THE MATTER OF THE COMPANIES ACT (2020 REVISION)[1] ("the Companies Act" or "the Act").

## AND IN THE MATTER OF CHANGYOU.COM LIMITED

1. **FourWorld Global Opportunities Fund, Ltd.**
2. **Corbin Opportunity Fund, L.P.**
3. **Corbin ERISA Opportunity Fund, Ltd.**
4. **Boothbay Diversified Alpha Master Fund LP**
5. **Boothbay Absolute Return Strategies, LP**
6. **Athos Asia Event Driven Master Fund**
7. **Athos Special Situations Fund SPC for and on behalf of Athos Global Opportunities SP 1; and**
8. **FMAP ACL Limited**

### Petitioners

| | |
|---|---|
| Appearances: | Jonathan Adkin QC instructed by Rocco Cecere, Genevieve White and Farrah Sbaiti of Collas Crill for the Petitioners |
| | Alex Potts QC and Erik Bodden of Conyers Dill & Pearman for Changyou.com Limited |
| Draft Judgment circulated: | 17 January 2021 |
| Date of Judgment: | 28 January 2021 |

---

[1] As styled pursuant to the citations of Acts of Parliament Act 2020



*Headnote*

***"Vertical" or "short-form" merger pursuant to section 233(7) of the Act – whether minority shareholders in a short-form merger have right to fair value appraisal of their shares pursuant to section 238 of the Act – whether absence of right to fair value appraisal would be in breach of Bill of Rights guarantee of protection of property from compulsory acquisition without adequate compensation – whether section 238 to be construed in conformity with the Bill of Rights.***

## JUDGMENT

1. On 7 September 2020, within the context of this, the Petitioners' petition for the Court's appraisal of the fair value of their shares, I directed with the consent of all parties, the trial of the following preliminary issue:

   *"Where a merger between a parent company and a subsidiary company is effected pursuant to section 233(7) of the Companies Law[2] of the Cayman Islands ("the Companies Law") is a member of the subsidiary company entitled to payment of the fair value of their shares [as appraised by the court] pursuant to section 238 of the Companies Law and, if so, what steps (if any) are required to be taken by such member to dissent from the merger?"* (**"the Preliminary Issue"**).

**Background to the application**

2. Changyou.com Limited (**"Changyou"**) is a Cayman Islands incorporated company operating in the People's Republic of China in the technology sector, among other things, as a leading developer and operator of online and mobile games. It was incorporated in 2007 as an indirect wholly-owned subsidiary of Sohu.com Limited (**"Sohu"**).

3. Between January 2020 and April 2020, a merger (the **"Changyou Merger"** or **"Merger"**) was announced and implemented, pursuant to an Agreement

---

[2] As it was then called.



and Plan of Merger ("**the Merger Agreement**"), dated 24 January 2020 entered into between Sohu.com (Game) Limited ("**Sohu Game**"), an indirectly wholly-owned subsidiary of Sohu; and Changyou Merger Co. Limited ("**Changyou Merger Co.**"), a direct wholly-owned subsidiary of Sohu Game, and Changyou.

4.   Pursuant to the Merger Agreement, Changyou Merger Co. merged with and into Changyou with effect from 17 April 2020 (the "**Effective Date**"), with Changyou (hereinafter "**the Company**") being the surviving company.

5.   Because, as the result of the corporate shareholdings described above, Changyou Merger Co. already owned over 90% (*viz*: 95.2%) of the voting power represented by all issued and outstanding shares of the Company, the Changyou Merger was not subject to a vote of the shareholders of the Company. Rather, in accordance with section 233(7) of the Act,  it was structured in the form of a "short-form" merger[3]; that is, one in which a subsidiary which is already at least 90% owned by a parent company (as that concept is defined by section 232 of the Act[4]), merges with the parent.

6.   The Petitioners, who are the minority shareholders holding the remaining 4.8% of the voting shares of the Company, were paid what was assessed in the context of the Merger to be the consideration for their shares ("**the Merger Consideration**"), as assessed by the independent consultants Houlihan Lokey (China) Limited ("**Houlihan Lokey**"). The Merger Consideration will be discussed further below.

---

[3] A short-form merger between a parent and a subsidiary is sometimes described as a "vertical merger" or a "vertical amalgamation".

[4] Which definition reads: "**parent company**" means, with respect to another company, a company that holds issued shares that together represent at least ninety per cent of the votes at a general meeting of that other company".

7.    The Petitioners have purported to dissent from the Merger and, as mentioned above, have petitioned for the appraisal of the fair value of their shares on the basis that section 238 of the Act gives them the right to do so.

8.    The result of the acquisition of the minority shareholding under the Merger is the privatization of the Company so that it became an indirect wholly-owned subsidiary of Sohu which is the ultimate 100% parent of Sohu Game. The following further background to the Merger comes from the Statement of Agreed Facts - that agreed between the parties for the purposes of the present application.

## Background to the Merger

9.    On 9 September 2019, with the goal of effecting an internal restructuring of the Sohu Group, Sohu sent the Company a proposal to acquire all its outstanding Class A Ordinary Shares not already owned or beneficially owned by Sohu for USD5.00 in cash per Class A Ordinary Share, or USD10.00 in cash per American Depository Share ("**ADS**"), in a "going-private" transaction ("**the Proposal**"). The Proposal, as per the Form 6-K filing with the United States Securities and Exchange Commission[5] ("**SEC**"),  implied an equity value of the Company, for the purposes of the Merger, in the order of USD579 million. The offer price was eventually increased, after negotiations, to USD5.40 per Class A Ordinary Share, or USD10.80 per ADS.

10.   On the date of the Proposal:

- Sohu directly held 1,500,000 Class A Ordinary Shares issued by the Company;

---

[5] Changyou being at the time a company whose ADSs were listed on the Nasdaq Global Select Market with each ADS representing two class A Ordinary Shares.



- Sohu, indirectly (through its wholly-owned subsidiary Sohu Game), held all 70,250,000 Class B Ordinary Shares issued by the Company; and

- Sohu, as already mentioned, thus held (directly and indirectly) 95.2% of the total voting power attributable to the issued shares of the Company.

11. In January 2020, the following steps had been taken to restructure the Sohu Group:

    - On 2 January 2020, Changyou Merger Co. (hereinafter "**Parent**") was incorporated as an exempted limited liability company in the Cayman Islands; and

    - On 13 January 2020, Sohu Game transferred to Parent all of the issued and outstanding Class B Ordinary shares in the Company held by Sohu Game.

12. As already mentioned, on 24 January 2020, the Company entered into the Merger Agreement with Sohu and Parent. The Company issued a press release announcing this on the same day.

13. Section 2.08 of the Merger Agreement stated:

    "*No Dissenter's rights. Each of the Parties hereto acknowledges and agrees that, because no vote of the shareholders of the Company to approve this Agreement, the Plan of Merger or the Merger is required and no such vote will be held, holders of the Shares, including Shares represented by ADSs, will not be able to exercise dissenters' rights under section 238 of the Companies Law*".

14. On 19 February 2020 the Company, Sohu, Sohu Game and Parent jointly filed with the SEC a transaction statement pursuant to section 13(e) of the Securities Exchange Act of 1934 ("**the Transaction Statement**") which set out details of the Merger. The Transaction Statement also made a number of statements in respect of the non-availability of dissenter's rights.



15. On 9 March 2020, the Company filed a Schedule 13E-3 (Amendment No. 1), which amended the Transaction Statement ("**the Amended Transaction Statement**"), to provide further details requested by the SEC.

16. On 27 March 2020, Collas Crill (the Cayman Islands attorneys acting for certain of the Petitioners) served on the Company letters respectively on their behalf. Those letters were in substantively identical terms and stated:

    (i) that each Petitioner did not agree that, because the Company is entitled to dispense with the need for a shareholder vote pursuant to section 233(7) of the Act, shareholders are not entitled to the right to payment of fair value under section 238(1), or otherwise;

    (ii) that, correctly interpreted, Part XVI [more specifically section 238] of the Act provides the statutory right to payment of fair value for members in respect of a merger to which section 233(7) applies, including the Merger;

    (iii) further as follows:

    *"Without prejudice to our client's rights, including its right to issue further written notifications:*

    *1. Our client hereby gives the Company written notice of its objection to the Merger and that it proposes to demand payment for its Shares if the Merger becomes effective.*

    *2. Our client hereby gives the Company written notice of its election to dissent from the Merger in respect of all Shares (i.e. 2,323,164 Class A ordinary Shares), and demands payment for the fair value of the Shares."*

17. As by 27 March 2020 not all the Petitioners had had registration of their shareholdings confirmed by the Company, after this was subsequently confirmed, Collas Crill also wrote on behalf of the others (i.e.: the FourWorld and Athos Petitioners), giving notice of their objection to the Merger and of their election to dissent from the Merger in terms materially the same as



those of the notices earlier given on behalf of the other Petitioners on 27
March 2020, as set out above.

18.   On 3 April 2020, Conyers Dill & Pearman on behalf of the Company,
      responded to the notices from FourWorld and Athos, again setting out the
      Company's position that dissenter's rights were not available in respect of
      the Merger.

19.   On 13 April 2020, the Company sent a copy of the final form of the plan of
      merger to every member of the Company and on 14 April 2020, the
      Company entered into and filed with the Registrar of Companies of the
      Cayman Islands a definitive plan of merger dated 14 April 2020 ("**the Plan
      of Merger**") effective on the Effective Date (i.e.: 17 April 2020). On 14
      April 2020, the Company also issued a press release announcing the filing of
      the Plan of Merger.

20.   Accordingly, on the 17 April 2020, the Merger became effective and as
      already explained but repeated here for emphasis; pursuant to the Merger,
      Parent merged with the Company, with the Company as the surviving
      company, and the Company became a private company wholly owned
      directly and indirectly by Sohu and the ADSs were no longer traded on the
      NASDAQ.

21.   On the same date, 17 April 2020, the Company issued a press release
      announcing the completion of the Merger.

22.   Between 30 April 2020 and 14 May 2020, the Merger Consideration was
      paid respectively to the various groups of Petitioners.

23.   On 22 May 2020, the Merger Consideration having been accepted under
      protest, Collas Crill wrote to Conyers Dill & Pearman setting out the
      Petitioners' common position in respect of the Merger and on 11 June 2020,



the Petitioners served the Petition on the Company. On 30 June 2020, the Petition, then as amended, was served on the Company.

## The Preliminary Issue

24.  Against that background, it will be readily apparent that the Preliminary Issue is one essentially of the construction of the relevant provisions of sections 233 (7) and 238 of Part XVI of the Act. As will be discussed further below, Part XVI sets out various provisions pursuant to which companies may merge or consolidate and minority shareholders compulsorily deprived of their shares may dissent from the merger or consolidation.

25.  Ordinarily, a merger or consolidation requires a special resolution of the members of each constituent company involved in the merger or consolidation, pursuant to subsection 233(6)(a) of the Act. However, where a parent company holding 90% or more of the voting rights in a subsidiary wishes to merge with that subsidiary, subsection 233(7) provides that no such vote is required. Hence, this is what is referred to as a "short-form" or "vertical" merger.

26.  Subsection 238(1) provides that a member of a constituent company incorporated under the Act, shall be entitled to payment of fair value of that person's shares upon dissenting from a merger or consolidation, and the other provisions of section 238 set out the mechanism by which the Court is to determine such fair value. Here the Company takes the position that this right to be paid fair value and have such fair value determined by the Court, is not engaged in short-form mergers because there was no right to vote and hence, no right to dissent. Rather, that the minority shareholder's rights in a short-form merger are limited as described by section 233, to be discussed below, to: (1) notice of the merger by provision of a copy of the Plan of Merger; (2) an expectation that the directors of the Company will have



exercised their powers to approve, authorize, and effect the Plan of Merger for a proper purpose, and to approve the merger consideration, in good faith in the best interests of the Company as a whole and fairly as between different shareholders of the Company (said by the Company to have been manifestly done here by the adoption of the share price assessed by the independent assessor Houlihan Lokey); (3) receipt of the merger consideration (here it was paid but accepted under protest)[6]; and (4) receipt of a copy of the certificate of merger pursuant to a director's undertaking under section 233(9)(g)[7].

27.    The Petitioners say that this position taken by the Company is plainly wrong, that the right to be paid fair value and have that value determined by the Court applies to all forms of merger and consolidation which take place pursuant to Part XVI of the Act, and that any other construction of the statute would result in the absurd position that a 90% majority shareholder could compulsorily acquire the minority shares at whatever price they saw fit to pay (or indeed no price at all). That while the procedure prescribed by section 238 for assessment of fair value by the Court stipulates a prerequisite notice of dissent (as will be further discussed below), the absence of any qualification upon that requirement exempting short-form mergers from it, should be regarded as an accidental oversight in the drafting of the Act. That the Act should therefore be construed so as to avoid the absurdity of the deprivation of the minority of the right to have the fair value of their shares assessed by the court.

---

[6] As evidenced by a series of letters sent by Collas Crill on behalf of the Petitioners on 27 March 2020 to Conyers on behalf of the Company, "reserving their rights" to petition the court on the issue of fair value.

[7] Which requires that a copy of the certificate of merger or consolidation (issued by the Registrar in keeping with section 233 (11)) will be given to the members and creditors of the constituent company and that notification of the merger or consolidation will be published in the Gazette.



28.  The Company rejects the characterization of its case as one advocating for a power of compulsory acquisition of the shares of the minority without fair compensation.    First, through Mr Potts QC, it was stressed that no contention is made for a right of unilateral or arbitrary assessment of share value but instead the acceptance that an independent assessment was required, as it is said happened here with Houlihan Lokey. Second, as Mr Potts also argued (by reference to case law to be discussed below), that it is always open to a shareholder to challenge before the court the directors' assessment of fairness as between shareholders, where it is felt that they do not act in good faith. Mr Potts described the available  recourses in rather general terms: "*if a member of the subsidiary company had a proper evidential basis for asserting that it was being treated unlawfully, oppressively, inequitably or unfairly by being subjected to a short-form merger without the ability to exercise statutory voting, dissent or appraisal rights of the sort available in the context of  long-form mergers under section 238, such a member might have other statutory, contractual or equitable rights or remedies which might be either personal or derivative in nature*".

29.  Such rights or remedies would not, however he argued, involve the exercise of statutory voting, dissent or appraisal rights pursuant to sections 233 (7) or 238 of the Act. The Company's position is simply that, in a short-form merger under section 233(7) of the Act, there is no statutory right to vote, to dissent or to bring statutory appraisal action under section 238 by petitioning for the Court's determination of the fair value of the Petitioners' former shares, with all the unique substantive, evidential and procedural



characteristics of that statutory recourse[8]. The absence of a section 238 appraisal right does not mean, however says Mr Potts, that an aggrieved minority shareholder might not have other rights, remedies or recourses available to it, if it wishes to pursue a legal challenge, depending on the circumstances.

30.  I will come below to examine the case law which Mr Potts contends reveals the other remedies or recourses.

31.  Mr Adkin QC argued for the Petitioners to the contrary making six main points which he summarized as follows:

(a)  The meaning of subsection 238(1) is clear and unambiguous. It confers the right to be paid fair value on any shareholder dissenting from a merger or consolidation, and does so in unqualified terms. Its evident purpose is to protect dissenting shareholders from an abuse by the majority. If Parliament had intended to confer such a right on persons dissenting from one form of merger only, and not upon those dissenting from short-form mergers, it would have said so in clear terms. It did not.

(b)  To exclude persons dissenting from short-form mergers from the appraisal rights conferred by subsection 238(1) would produce an absurd result. It would mean that any shareholder acquiring a 90% majority holding in a company could compulsorily acquire the minority's shares at whatever price and on whatever terms they wish, whilst the minority would have no right of redress whatsoever. Such a construction would violate the presumption against absurdity, the

---

[8] These are well known, having been the subject of much discussion in the local case law in the context of long-form mergers. See for instance **Shanda Games Ltd v Maso Capital Investments ltd and Others** [2020] UKPC 2; **In the Matter of Qunar Cayman Islands Limited** 2019 (1) CILR 611; **In the Matter of Nord Anglia Education Inc**, Cause FSD 235 OF 2017 (IKJ)(unreported 17 March 2020); **In the Matter JA Solar Holdings Co Ltd**, Cause FSD 153 of 2018 (ASCJ) (unreported 17 July 2019).



presumption that the law should be just and fair, and the presumption against deprivation of property without compensation.

(c)     To exclude persons dissenting from short-form mergers from the appraisal rights conferred by subsection 238(1) would also produce significant inconsistencies within the Companies Act itself, both as between the regime set out in Part XVI and other regimes under which shares can be compulsorily acquired under the legislation, and as between various other provisions of Part XVI. These include schemes of arrangement and "squeeze-outs" under sections 86 to 88 of the Act, (also to be further discussed below).

(d)     A construction which excludes minority dissenter's rights would also render the Cayman Islands legislation an outlier amongst the other legislative regimes which were said to have been drawn upon when Part XVI of the Act was introduced into legislation, which further indicates that this was not the intention of Parliament.

(e)     Since the Company's construction would potentially place the Companies Act in breach of section 15 of the Constitutional Bill of Rights, unless it can properly be said that the legislation clearly and unambiguously means what the Company says it means, the Court is obliged by section 25 of the Constitution to reject such construction and to construe section 238 of the Act in a way which gives effect to the rights conferred by section 15 of the Constitution.

(f)     Finally says Mr Adkin, insofar as necessary, the provisions setting out the mechanics of any appraisal in subsections 238(2), (4) and (5) of the Act upon which the Company relies for its contention that the right to fair value in section 238(1) is qualified in the case of short-



form mergers, can be construed so as to allow the appraisal process to operate properly in the absence of any vote under subsection 233(6).

32.    It will be clear from the contrary arguments as summarized above, that the Preliminary Issue arises from the absence of any provision which specifically references a right of the minority to dissent or to have appraisal rights in respect of their shares in a short-form merger. The task of construction presented is therefore one that has its obvious starting point in the relevant provisions of the Act, *viz*: sections 232, 233 and 238.

33.    I set them out following, with emphases upon the most germane provisions:

## Companies Act (2020 Revision)

### "Part XVI – Merger and Consolidation

*"232.*    *In this Part –*

        ...

        *"constituent company" means a company that is participating in a merger or consolidation with one or more other companies; ...*

        ***"parent company"*** *means, with respect to another company,* ***a company that holds issued shares that together represent at least ninety per cent of the votes at a general meeting of that other company***[9]*;*

---

[9] This express (and deliberate) statutory definition of a 'parent company' in section 232 is said by Mr Potts to be important to the interpretation of section 233(7). He submits that it should be noted that the current version of section 232 was the product of amendments made by section 46 of the Companies (Amendment) Act 2011: between 2009 and 2011. The prior definition of "*parent company*" under section 2 of the Companies (Amendment) Act 2009 was "*a company that owns at least ninety per cent of the issued shares of each class in a subsidiary company that are entitled to vote*". As to the legal and commercial significance of the 90% threshold, in ***Blue Metal Industries Ltd v R W Dilley*** [1970] AC 827 **[B/13]**, the Privy Council noted, that the 90% figure was practically total ownership of a company. See, in particular, the comments of Lord Morris at 849A: "*the significance of the 90 per cent, figure is,*


"subsidiary company" means, with respect to another company, a company of which that other company is the parent company..."

233 (1)   *Without prejudice to sections 86 and 87[10], but subject to section 239A[11], **two or more companies limited by shares and incorporated under this Act, may, subject to any express provisions to the contrary in the memorandum and articles of association of any of such companies, merge or consolidate in accordance with subsections (3) to (15).***

...

233 (3)   **The directors of each constituent company** *that proposes to participate in a merger or consolidation* **shall on behalf of the constituent company of which they are directors approve a written plan of merger or consolidation.**

233 (4)   *The plan referred to in subsection (3) shall give particulars of the following matters –*

...

on this view, that once a company has become so nearly a total owner, or parent, of another company as a shareholding of 90 per cent, would represent, it should not be prevented from converting the other company into a wholly owned subsidiary by so small a dissenting minority as 10 per cent or less but should be entitled to acquire the holding of that minority. Their Lordships are of the opinion that the second of these views is to be *preferred*". This was however, said in the context of a "squeeze-out" where the court was expressly given the power not to approve of the acquisition of the minority interests if the power of acquisition was used by the 90% majority for an improper purpose, as will be discussed further below by reference to *In Re Bugle Press* [1961] 1 Ch 270. The Preliminary Issue arises in this case precisely because of the absence of an express provision for the protection of a dissenting minority in a short-form merger.

[10] Sections 86 and 87 relate to Arrangements and Reconstructions (i.e. Court-sanctioned Schemes of Arrangement). Section 88 relates to compulsory acquisition powers pursuant to general offers (also known as "squeeze-outs").
[11] Section 239A relates to segregated portfolio companies and is not applicable in this case.



*(e) the terms and conditions of the proposed merger or consolidation, including where applicable, the manner and basis of converting shares in each constituent company into shares in the consolidated or surviving company or into other property as provided in subsection (5); ...*

...

233 (5)    *Some or all of the shares whether of different classes or of the same class in each constituent company* **may be converted into or exchanged for different types of property** *(consisting of shares, debt obligations or other securities in the surviving company or consolidated company or any other corporate entity,* **or money or other property***, or a combination thereof)* **as provided in the plan of merger or consolidation.**

233 (6)    *A plan of merger or consolidation* **shall be authorised by each constituent company by way of** *–*

     *(a) a special resolution*[12] **of the members of each such constituent company;** *and*

     *(b) such other authorisation, if any, as may be specified in such constituent company's articles of association.*

233 (7)    **Notwithstanding subsection (6)(a), if a parent company incorporated under this Act is seeking to merge with one or more of its subsidiary companies incorporated under this Act, a special resolution under that subsection of the members of**

---

[12] "Special resolution" is defined by sections 2 and 60(1) of the Act by reference to the required majorities or otherwise by unanimity as may be required by the articles of a company.



*such constituent companies is not required* if a copy of the plan of merger is given to every member of each subsidiary company to be merged unless that member agrees otherwise. **[(This is the short-form merger provision)]**

…

238 *(1)*    *A member of a constituent company* incorporated under this Act **shall be entitled to payment of the fair value of that person's share upon dissenting from a merger or consolidation.**

*(2)*    *A member who desires to exercise that person's entitlement under subsection (1) shall give to the constituent company,* **before the vote on the merger or consolidation, written objection to the action.**

*(3)*    *An objection under subsection (2) shall include a statement that the member proposes to demand payment for that person's shares* **if the merger or consolidation is authorised by the vote.**

*(4)*    *Within twenty days immediately following the date* **on which the vote of members giving authorisation for the merger or consolidation is made, the constituent company shall give written notice of the authorisation to each member who made a written objection.**



(5)   *A member who elects to dissent shall, within twenty days immediately following the date on which the notice referred to in subsection (4) is given,* give to the constituent company a written notice of that person's decision to dissent, stating-

    (a)   his name and address;

    (b)   the number and classes of shares in respect of which that person dissents; and

    (c)   a demand for payment of the fair value of that person's shares.

(6)   ...

(7)   *Upon the giving of a notice of dissent under subsection (5), the member to whom the notice relates shall cease to have any of the rights of a member except the right to be paid the fair value of that person's shares* and the rights referred to in subsections (12) and (16).

(8)   *Within seven days immediately following the date of the expiration of the period specified in subsection (5), or within seven days immediately following the date on which the plan of merger or consolidation is filed, whichever is later,* the constituent company, the surviving company or the consolidated company *shall make a written offer to each dissenting member to purchase that person's shares at a specified price that the company determines to be their fair value; and if,*

Page **17** of **71**



within thirty days immediately following the date on which the offer is made, the company making the offer and the dissenting member agree upon the price to be paid for that person's shares, the company shall pay to the member the amount in money forthwith.

(9)   *If the company and a dissenting member fail, within the period specified in subsection (8), to agree on the price to be paid for the shares owned by the member, within twenty days immediately following the date on which the period expires-*

    (a)   *the company shall (and any dissenting member may) file a petition with the Court for a determination of the fair value of the shares of all dissenting members; and*

    (b)   *the petition by the company shall be accompanied by a verified list containing the names and addresses of all members who have filed a notice under subsection (5) and with whom agreements as to the fair value of their shares have not been reached by the company.*

(10)  ...

(11)  At the hearing of a petition, the Court shall determine the fair value of the shares of such dissenting members as it finds are involved, together with a fair rate of interest, if



*any, to be paid by the company upon the amount determined to be the fair value.*

*(12) ...*

*(13) ...*

*(14) ...*

*(15) Shares acquired by the company pursuant to this section shall be cancelled and, if they are shares of a surviving company, they shall be available for reissue.*

*(16)* **The enforcement by a member of that person's entitlement under this section shall exclude the enforcement by the member of any right to which that person might otherwise be entitled by virtue of that person holding shares***, except that this section shall not exclude the right of the member to institute proceedings to obtain relief on the ground that the merger or consolidation is void or unlawful".*

An ancillary point was taken by Mr Adkin requiring consideration of section 239, which I therefore also set out here:

*"239 (1) No rights under section 238 shall be available in respect of the shares of any class for which an open market exits on a recognized stock exchange or recognized interdealer quotation system at the expiry date of the period allowed for written notice of an election to dissent under section 238(5), but*



this section shall not apply if the holders thereof are required by the terms of a plan of merger or consolidation pursuant to section 233 or 237 to accept for such shares anything except –

(a)     shares of a surviving or consolidated company, or depository receipts in respect thereof;

(b)     shares of any other company, or depository receipts in respect thereof, which shares or depository receipts at the effective date of the merger or consolidation, are either listed on a national securities exchange or designated as a national market system security on a recognized interdealer quotation system or held of record by more than two thousand holders;

(c)     cash in lieu of fractional shares, or fractional depository receipts described in paragraphs (a) and (b); or

(d)     any combination of the shares, depository receipts and cash in lieu of fractional shares or fractional depository receipts described in paragraphs (a), (b) and (c).

(2)     Repealed by section 11 of the Companies (Amendment) (No. 2) Act, 2018 [Act 46 of 2018]"

34.     I now turn to discuss the competing arguments, interpolated with my observations, to be followed by my analysis and conclusions.

## The language and purpose of section 238(1)

35.     The leading authority on the interpretation of section 238 of the Act is the decision of the Privy Council in **Shanda Games Ltd v Maso Capital Investments Ltd** [2020] UKPC 2, in which Lady Arden gave the decision of the Board. In addition to a short point on the awarding of interest in section



238 cases, that case was concerned with the question of whether, in determining 'fair value' under section 238, it was necessary or permissible to apply a minority discount to each dissenter's shareholding. That issue turned on the proper construction of the term 'fair value' in section 238. In considering that issue, the Board considered the nature and effect of section 238 more generally.

36. I note here that it must however, be emphasized that ***Shanda Games*** involved a long-form merger under section 233(6) of the Act, where the special resolution of a majority of more than two-thirds required for approval of the merger was obtained and so the question of dissenter rights in a short-form merger was not directly engaged.

37. Lady Arden nonetheless summarized the nature and purpose of the rights conferred by section 238 at paragraphs 1 and 2 of her Judgment, as follows:

> *"1. A key feature of the statutory regime for mergers in the Cayman Islands is that it gives significant rights to dissenting shareholders ("dissenters"). They include an appraisal right, that is, the right to apply to the Grand Court for determination of the "fair value" of their shares and a right to the payment of "a fair rate" of interest on the outstanding consideration. ...*
>
> *2. Under section 238 of the Companies Law ... where there has been a merger or consolidation involving at least one Cayman company pursuant to Pt XVI of the Companies Law, a dissenter is entitled to payment of the "fair value" of his shares. If the dissenter and the constituent company cannot agree on "fair value", the company shall, or he may, present a petition to the Grand Court for its determination of the fair value of his shares and a fair rate of interest, if any, to be paid by the company."*



38.     It is notable that in this summary of the appraisal rights conferred by section 238, Lady Arden did not qualify her description of the breadth of the right by reference to any limitation excluding dissenters from short-form mergers.

39.     At paragraph 27, Lady Arden also summarized the nature of the task of construction with which the Board was concerned:

> *"27. The Board considers that, when and to the extent that any issue arises as to the valuation of shares under s.238, the meaning of the words "fair value" used in s.238(1) is to be ascertained by statutory interpretation. In that situation, the court has to ascertain the intention of the legislature from the words it has used in their context, and also in the light of any material which demonstrates the mischief that it was concerned to redress by the statutory provision."*

40.     That reasoning adopted by the Board in construing the term 'fair value' in subsection 238(1) is significant in the context of this case, submits Mr Adkin. That it is important to note the way in which Lady Arden approached the question of construction, in which she made clear that the court has to ascertain the intention of Parliament from the words it has used in their context, and also in light of any material which demonstrates the mischief that it was concerned to redress by the statutory provision.

41.     The words Parliament has chosen to use in subsection 238(1) are, indeed, unqualified. That provision establishes that *"a member of a constituent company incorporated under this Law shall be entitled to payment of the fair value of that person's shares upon dissenting from a merger or consolidation."* [emphasis added]. The subsection is not in terms limited to members who dissent only from a long-form merger or consolidation approved under subsection 233(6) and does not expressly exclude members who dissent from a short-form merger approved under subsection 233(7).



There is, therefore, submits Mr Adkin, nothing in the language of subsection 238(1) to support the Company's position.

42. The mischief which Parliament was concerned to redress in enacting subsection 238(1) is equally clear, he submits. The merger and consolidation provisions set out in section 233 enable a minority of shareholders to be compulsorily deprived of their property (i.e. their shares) against their wishes. The *quid pro quo* for that is an entitlement to be paid fair value for that property by the Company, which is what subsection 238(1) provides. Were such a *quid pro quo* not available to that minority, they could be deprived of their property at whatever price the holder with the requisite majority chose, irrespective of whether such price represented the actual value of their shares. That is self-evidently the mischief at which the appraisal rights conferred by subsection 238(1) is directed: to prevent minority shareholders from being deprived of their property for anything other than its fair value.

43. The Company's case in effect, is that, notwithstanding the unqualified terms in which subsection 238(1) is drafted and the evident purpose of the provision, Parliament should be taken to have intended to cut down its scope by the reference in subsection 238(2) to a person wishing to exercise their entitlement under subsection (1) having to give the constituent company *"before the vote on the merger or consolidation"* written objection to the action, and by the references in subsections 238(4) and (5) to notice of the authorisation of the merger or consolidation being given *"[w]ithin twenty days immediately following the date on which the vote of members giving authorisation for the merger or consolidation is made"*.

44. Taken at face value, these provisions of subsections 238(2), (4) and (5) do imply that a person wishing to exercise entitlement under subsection 238(1)



to apply to the court for appraisal must also be a person entitled to dissent from the vote for the merger and to have given written objection of an election to dissent. Thus, the Company's case is that, if there was no entitlement to vote in the first place as in the case of a short-form merger under subsection 233(7) (where no special resolution is required); then it would follow that the section 238 appraisal right is not available to a shareholder who purports to dissent from a short-form merger.

45. Incongruous though this construction might seem in face of the otherwise clear right to have a fair value appraisal by the court, it is Mr Potts' submission that the court is bound to follow the plain words of the statute. Thus, the "intention of Parliament" must be objectively ascertainable by reference to admissible material – the words of the statute themselves. Moreover, that, as the Court of Appeal noted in ***Ming v R*** 2009 CILR Note 28 *"It was not the proper role of the Court to give effect to what "the Legislature must have intended", when, on a true construction of the provision in question, that intention could not be discerned. The role of the Court was to interpret the legislation as it had been enacted rather than determining what might have been enacted had the draftsman been more skilful. It was not for the Court to legislate under the guise of interpretation and mistakes were for the legislature to correct."*

46. By way of further emphasis, Mr Potts cited the dictum of Lord Collins from ***Singularis Holdings Ltd v PricewaterhouseCoopers (Bermuda)*** [2014] UKPC 36 where he held at [78] to [83] that it would be *"contrary to the established relationship between the judiciary and the legislature"* for the court to *"apply legislation, which, ex hypothesi does not apply, "as if" it applied."* And further, from Lord Neuberger's judgment at [160] to [161]: *"…these distinctions* [made by the judge at first instance] *seem to me to*



*embody the sort of requirements one would expect to see in a statutory code rather than in judge-made law. As the judicial observations cited by Lord Collins suggest, judge-made law should be limited to "very modest development[s] … of existing principle*" and should be made "*in small steps*" or "*within … interstitial limits*" … "*In this highly legislated area, I consider that the power which is said to arise in this case is one which should be bestowed on the court by the legislature, and not arrogated to the court of its own motion.*"

47.     The Petitioners submit, in response through Mr Adkin, that it is fanciful to suppose that Parliament intended to deny a minority objecting to a short-form merger the right to appraisal by the court, making such a significant inroad into the broad rights and purpose of subsection 238(1) by way of a side-wind through the subsequent subsections dealing simply with the mechanical procedures by which appraisal rights are to be exercised. That is doubly so, says Mr Adkin, given the absurdity and injustice which would result from such an approach.

48.     He invited the court instead to harken to other precepts of statutory construction which he submits are more appropriately to be applied here.

**The presumption against absurdity**

49.     The first is the presumption against absurdity. Put simply, it is that the Court will seek to avoid a construction of a statute which would result in absurd consequences. As stated by Lord Millett in the House of Lords decision of ***R (on the application of Edison First Power Ltd) v Central Valuation Officer*** [2003] UKHL 20:

> "*116. …The courts will presume that Parliament did not intend a statute to have consequences which are objectionable or undesirable; or absurd; or unworkable or impracticable; or*



*merely inconvenient; or anomalous or illogical; or futile or pointless.*

*117. The strength of these presumptions depends on the degree to which a particular construction produces an unreasonable result. The more unreasonable a result, the less likely it is that Parliament intended it."*

50. To similar effect, in the UK Supreme Court decision of **R (on the application of Noone)(FC)(Appellant) v Governor of Drake Hall Prison** [2010] UKSC 30 Lord Saville SCJ held as follows (at paragraph 41):

> *"I would allow this appeal. For the reasons given by Lord Phillips and Lord Mance, I have no doubt that by one route or another the legislation must be construed so as to avoid what would otherwise produce irrational and indefensible results that Parliament could not have intended."*

### The presumption that the law should be just and fair

51. Second, Mr Adkin relies upon the principle of legal policy that the law should be just and fair, and the court, when considering, in relation to the facts of a case, which of the opposing constructions of an enactment should be adopted, should presume that the legislator intended to observe this principle: see, for example, **IRC v Hinchy** [1960] AC 748 at 768.

### The presumption against deprivation without compensation

52. Third, he submitted that it is a well-established principle of construction that legislation should be construed against allowing deprivation of property without compensation. Indeed, as long ago as the eighteenth century it was said by Pratt CJ in **Entick v Carrington** (1765) 19 State Tr 1029 at 1066 (the leading case against general warrants), that *"[t]he great end, for which men entered into society, was to secure their property. That right is preserved sacred and incommunicable in all instances where it has not been ... abridged by some public law for the good of the whole."*



53.  This principle was articulated again in the nineteenth century. In the English Court of Appeal decision of ***A-G v Horner*** (1884) 14 QBD 245 at 257 Brett MR held as follows:

> "…*[I]t is a proper rule of construction not to construe an Act of Parliament as interfering with or injuring persons' rights without compensation, unless one is obliged to so construe it.*"

54.  The principle has been repeated many times since. For example, in ***Methuen-Campbell v Walters*** [1979] QB 525 the English Court of Appeal approached the construction of the relevant statute on the basis that dispropriating legislation should be construed in favour of the party expropriated: see Buckley LJ at 542. Similarly, in ***Chilton v Telford Development Corporation*** [1987] 1 WLR 872 at 878 to 879 Purchas LJ, with whom the rest of the English Court of Appeal agreed, adopted a construction which most favoured the person whose land was sought to be compulsorily acquired under the relevant legislation, bearing in mind in particular that the relevant provisions, (as in this case with the provisions of section 238 of the Act), were primarily enacted for the protection of such a person.

## The correction of drafting errors

55.  Fourth, Mr Adkin submits that it is well established that the role of the Court in construing legislation is not confined to resolving ambiguities in statutory language, but extends to correcting drafting errors. This was made clear by the House of Lords in ***Inco Europe Ltd v First Choice Distrib Ltd*** [2000] 1 WLR 586, in which Lord Nicholls stated at page 592 as follows:

> "*It has long been established that the role of the courts in construing legislation is not confined to resolving ambiguities in statutory language. The court must be able to correct obvious*



drafting errors. In suitable cases, in discharging its interpretative function the court will add words, or omit words or substitute words. Some notable instances are given in Professor Sir Rupert Cross's admirable opuscule, Statutory Interpretation, 3rd ed. (1995) pp. 93 –105. He comments, at p. 103:

> 'In omitting or inserting words the judge is not really engaged in a hypothetical reconstruction of the intentions of the drafter or the legislature, but is simply making as much sense as he can of the text of the statutory provision read in its appropriate context and within the limits of the judicial role.'

> This power is confined to plain cases of drafting mistakes. The courts are ever mindful that their constitutional role in this field is interpretative. They must abstain from any course which might have the appearance of judicial legislation. A statute is expressed in language approved and enacted by the legislature. So the courts exercise considerable caution before adding or omitting or substituting words. Before interpreting a statute in this way the court must be abundantly sure of three matters: (1) the intended purpose of the statute or provision in question; (2) that by inadvertence the draftsman and Parliament failed to give effect to that purpose in the provision in question; and (3) the substance of the provision Parliament would have made, although not necessarily the precise words Parliament would have



*used, had the error in the Bill been noticed. The third of these conditions is of crucial importance. Otherwise any attempt to determine the meaning of the enactment would cross the boundary between construction and legislation (see per Lord Diplock in Jones v Wrotham Park Settled Estates [1980] A.C.74, 105–106."*

## The Constitution

56.   Finally, and very importantly submits Mr Adkin, section 25 of the Bill of Rights enshrined in Part 1 of the Constitution of the Cayman Islands (the **"Bill of Rights"** and the **"Constitution"**) provides that *"[i]n any case where the compatibility of primary or subordinate legislation with the Bill of Rights is unclear or ambiguous, such legislation must, so far as it is possible to do so, be read and given effect in a way which is compatible with the rights set out in this Part."*

57.   This is incontrovertibly, a pivotal provision by reference to which the enactments of the Cayman Islands Parliament fall to be interpreted. See ***Ebanks v R*** 2007 CILR 404; ***In re Nairne*** 2013 (1) CILR 358 and ***In re Borden*** 2013 (2) CILR 444. I will return to discuss the application of section 25 below.

## Would the Company's approach result in absurdity and injustice?

58.   Against the backdrop of the foregoing case law, the Petitioners also submit that the construction contended for by the Company would result in an absurd result which would unjustly allow a 90% majority shareholder of a company to expropriate the minority's shares at whatever price they chose (or indeed at no price at all). Such a construction would offend the presumption against absurdity, the presumption that the law should be just



and fair, and the presumption that there should be no deprivation of property without compensation.

59.   As elaborated, their argument in this context, is that if subsection 238(1) is construed so as not to extend to dissenters under short-form mergers, a 90% shareholder of a subsidiary company could, under subsection 233(7), compulsorily acquire the 10% minority's shareholding at will, against their wishes, and for whatever sum (if any) it chose to pay. There is no statutory mechanism available in the Companies Act to prevent such an abuse, other than the right of a dissenting minority shareholder to be paid fair value conferred by subsection 238(1). If the Company is correct, the holders of shares in any Cayman Islands company in which a single shareholder or group of shareholders held (or acquired) a 90% majority could simply have their shares compulsorily taken from them without effective redress. That is a result which Parliament cannot sensibly be taken to have intended. Indeed, it is the very mischief which subsection 238(1) is plainly intended to prevent.

60.   As well as being unjust, it is also a construction which is illogical and absurd, says Mr Adkin. It is common ground that where a long-form merger is effected by approval of a special majority (i.e. a two-thirds vote of shareholders) under subsection 233(6)(a), the right of dissenting minority shareholders to be paid fair value for their shares under subsection 238(1) is engaged. Why, it might fairly be asked, should Parliament be taken to have intended that the position would be different if the merger is effected by approval of a 90% shareholder under the short-form process set out in subsection 233(7)?   The dissenting minority in such a case is no less deserving of protection against the compulsory acquisition of its property for



less than its fair value. The Company has identified no logical reason why it should be.

## Inconsistency with other provisions of the Companies Act

61. The Petitioners submit that there are two important respects in which the Company's contended-for construction would be inconsistent with other provisions of the Act. First, it is inconsistent with the other regimes set out in the Act whereby the shares of a minority can be compulsorily acquired at a value approved by the Court. Second, it is inconsistent with other provisions within Part XVI of the Act itself. These points are dealt with in turn below.

## Inconsistency with other regimes in other Parts of the Companies Act

62. The Act contains, at sections 86 to 88, two other sets of provisions whereby shareholders can be forced to sell their shares. First, sections 86 and 87 together contain provisions concerning schemes of arrangement, under which dissenting shareholders have the right to approach the Court to prohibit the relevant transaction on grounds of fairness. In addition, subsection 88(1) contains what is commonly referred to as a 'squeeze-out' provision, which provides as follows:

> *"Where a scheme or contract involving the transfer of shares or any class of shares in a company (in this section referred to as "the transferor company") to another company, whether a company within the meaning of this Act or not (in this section referred to as "the transferee company") has, within four months after the making of the offer in that behalf by the transferee company, been approved by the holders of not less than ninety per cent in value of the shares affected, the transferee company may, at any time within two months after the expiration of the said four months, give notice in the prescribed manner to any dissenting shareholder that it desires to acquire that person's shares, and where such notice is given the transferee company shall, unless on an application made by*



> *the dissenting shareholder within one month from the date on which the notice was given, the Court thinks fit to order otherwise, be entitled and bound to acquire those shares on the terms on which under the scheme or contract the shares of the approving shareholders are to be transferred to the transferee company."*

63.    Thus, the squeeze-out provision enables a 90% majority of the shareholders of a company which receives an acquisition offer from another company to require a 10% minority dissenting from such offer to part with their shares on the terms of the offer unless, on an application made by a dissenting shareholder within the prescribed period, the court thinks fit to order otherwise.

64.    This provision adopted from UK companies legislation, has a long history and has its current expression in section 979 of the U.K. Companies Act 2006.

65.    In practice, as Lady Arden explained at paragraph 33 of her judgment in **Shanda Games**, what a squeeze-out provision of this sort means is that *"where an offeror who acquires 90% in value of the shares to which his offer relates and (where the offer relates to voting shares) 90% of the voting rights carried by those shares, he has a statutory right ... to compel the remaining shares to be transferred to him."* As Lady Arden also made clear (at paragraph 31 of her judgment), the courts of the Cayman Islands would apply English law when interpreting the equivalent squeeze-out provision in the Companies Act.

66.    It will be immediately seen that the squeeze-out provision at subsection 88(1) of the Act is similar in certain important respects to the short-form merger provision at subsection 233(7) of the Act. Both allow a minority to have their shares compulsorily acquired if a 90% majority of shareholders



vote to accept an offer (in the case of the squeeze-out provisions) or to merge (in the case of a short-form merger). There is of course a significant potential difference: in a squeeze-out, the 90% majority can be made up of unaffiliated shareholders who have no connection with the offeror or each other; whereas in a short-form merger, the 90% shareholder is the parent company of the subsidiary with which it is merging. It is however, as Mr Adkin submits, instructive to consider how the English courts have considered the position where a single 90% shareholder which is also an offeror, attempts to use the squeeze-out provision to remove a 10% minority in the target company: that is almost exactly analogous to the position on a short-form merger.

67.     Such a situation arose for consideration by the English Court of Appeal in ***In re Bugle Press*** [1961] 1 Ch 270. In that case, the 90% majority shareholders in company 'A' incorporated company 'B' for the purpose of making an offer to obtain the whole of the shareholding in company A. Company B made the offer, which the majority shareholders accepted, and sought to require the minority to transfer their shares to company B on the terms of the offer in reliance on subsection 209(1) of the Companies Act 1948, which was the then English equivalent of the squeeze-out provisions in subsection 88(1) of the Act. The minority shareholders applied to the Court for a declaration that they were not required to accept company B's offer and transfer their shares to it.

68.     The Court of Appeal gave the declaration sought by the minority. Lord Evershed MR, in the lead judgment, set out his reasoning at page 286 as follows:

> "[I]t seems to me plain that what the section is directed to is a case where there is a scheme or contract for the acquisition of a



*company, its amalgamation, re-organisation or the like, and where the offeror is independent of the shareholders in the transferor company or at least independent of that part or fraction of them from which the 90 per cent, is to be derived. Even, therefore, though the present case does fall strictly within the terms of section 209, the fact that the offeror, the transferee company, is for all practical purposes entirely equivalent to the nine-tenths of the shareholders who have accepted the offer, makes it in my judgment a case in which, for the purposes of exercising the court's discretion, the circumstances are special—a case, therefore, of a kind contemplated by Maugham J. to which his general rule[13] would not be applicable. ... [I]f the minority shareholder does show, as he shows here, that the offeror and the 90 per cent, of the transferor company's shareholders are the same, then as it seems to me he has, prima facie, shown that the court ought otherwise to order, since if it should not so do the result would be ... that the section has been used not for the purpose of any scheme or contract properly so called or contemplated by the section but for the quite different purpose of enabling majority shareholders to expropriate or evict the minority: and that, as it seems to me, is something for the purposes of which, prima facie, the court ought not to allow the section to be invoked—unless at any rate it were shown that there was some good reason in the interests of the company for so doing, for example, that the minority shareholder was in some way acting*

---

[13] Expressed in *In re Hoare &Co* 150 L.T. 374, where he stated the general principle that as an application can only come before the court when 90 per cent or more of the shareholders had accepted the offer (barring exceptional circumstances) the court is obliged to approve the scheme unless it is affirmatively established by the minority that the scheme is unfair, thus placing the onus of proof upon the minority.



*in a manner destructive or highly damaging to the interests of the company from some motives entirely of his own."*

69.    Harman LJ, agreeing with Lord Evershed MR, held (at page 287) that *"[i]n my judgment this is a barefaced attempt to evade that fundamental rule of company law which forbids the majority of shareholders, unless the articles so provide, to expropriate a minority."* Donovan LJ agreed with both judgments (at page 289).

70.    The upshot of this is that as a matter of English law (by reference to which, following ***Shanda Games***, the Cayman Islands squeeze-out provisions are to be construed and applied) it is not possible for a 90% majority to take advantage of the squeeze-out provisions in subsection 88(1) of the Companies Act to force a minority to agree to a sale of their shares on the majority's chosen terms to that majority or its corporate vehicle. This, as Mr Adkin submits, is significant in the present context because, on the Company's contended-for construction of subsection 238(1), a 90% majority would be able to achieve exactly that: they could force out the minority on whatever terms they wished. In other words, they would be able to achieve through the short-term merger route precisely what they would be prohibited from achieving through the squeeze-out route: the expropriation of the minority's shares on whatever terms they chose.

71.    The Company's approach would, therefore, he submits lead to a complete incoherence between the provisions of the Act. Parliament cannot be taken to have intended that subsection 238(1) should be construed in a way which would permit a 90% majority shareholder to achieve by way of a short-form merger precisely that which the courts have held it cannot achieve through a



squeeze-out. If Parliament had intended to achieve such a result, it would surely have made this very clear in the legislation. It did not.

72. In ***Shanda Games*** the Board did indeed interpret section 238 by reference to the analogous squeeze-out provisions. Lady Arden held at paragraph 36 of her Judgment that they were *"comparable provisions in the same legislation"* and that *"they perform a function which is comparable to that performed by section 238 in providing for the review of the valuation of shares in a publicly-held company on the occasion of a non-voluntary disposition."*

73. Mr Adkin submits that the Court should approach the interpretation of section 238 in the present case in the same way, so as to avoid any inconsistency between the approach to that provision and the approach adopted by the Courts to the squeeze-out provisions in subsection 88(1).

### The other provisions of Part XVI of the Companies Act

74. In addition to the above matters, if the Company's contended-for construction were correct, says Mr Adkin, it would also give rise to a number of anomalous inconsistencies with other provisions within Part XVI of the Act, as follows.

75. First, section 237 of the Act sets out provisions applicable where one or more companies incorporated under the Act wishes to merge or consolidate with one or more <u>overseas</u> companies. Subsection 237(2) requires compliance by each constituent company with the requirements of subsections 233(3) to (10) (which, at 233(7), include the short-form merger provision) and imposes additional requirements. One additional requirement is imposed by subsection 237(10), which provides as follows:

> *"(10) Where the surviving or consolidated company is to be an overseas company, the surviving or consolidated overseas*



> *company shall file with the Registrar - (a) an undertaking that*
> *it will promptly pay to the dissenting members of a constituent*
> *company incorporated under this Act the amount, if any, to*
> *which they are entitled under section 238"*

76. The requirement for the surviving or consolidated company, if an overseas
    company, to file with the Registrar an undertaking that it will promptly pay
    to the dissenting members of a constituent company the amount, if any, to
    which they are entitled under section 238, is evidently designed to ensure
    that surviving overseas companies comply with their obligations to pay fair
    value to dissenting shareholders notwithstanding they are outside the
    jurisdiction of the Cayman Court. There is, it must be noted, no carve out in
    this provision for short-form mergers, with the consequence that even where
    there is a short-form merger in which the surviving company is to be an
    overseas company, an undertaking to pay dissenters' entitlements under
    section 238 is still required. Such an undertaking would indeed, be
    redundant, if shareholders who dissented from the merger did not acquire
    any right to be paid fair value under section 238 on a short-form merger, as
    the Company contends.

77. Nor does the inclusion in subsection (10) of the qualifying phrase *"if any"*
    assist the Company as Mr Potts contends, since it is clear that the phrase is
    concerned with the possibility of an appraisal under section 238 concluding
    that no additional payment is required to dissenters beyond what they have
    already been offered and received. If a dissenter under a short-form merger
    could *never* have a right to be paid fair value, then there would be no point
    in requiring such an undertaking in relation to short-form mergers. Yet,
    clearly, it is required.

78. This, I indicate here, I find to be a compelling analysis of subsection 237
    (10) primarily because, like subsection 238(1) itself which stipulates the



right to apply to the court for appraisal of fair value, there is no exclusion of a short-form merger from its provisions. The Company's contended-for construction of section 238 would, therefore, result in the anomalous position of a right to court appraisal for minorities under short-form mergers involving overseas companies but not otherwise.

79.    Further, section 238 sets out provisions for the exchange by dissenters of their shareholder rights for the right to be paid fair value and this consequence will follow whether in the context of a long-form or short-form merger. Again for ease of reference here, subsection 238(7) provides as follows:

> *"(7) Upon the giving of a notice of dissent under subsection (5), the member to whom the notice relates shall cease to have any of the rights of a member except the right to be paid the fair value of that person's shares and the rights referred to in subsections (12) and (16)" [i.e. the right to participate in the fair value proceedings or the right to obtain relief on the ground that the merger or consolidation is void or unlawful]."*

80.    There is a corresponding provision at subsection 238(15), which provides as follows:

> *"(15) Shares acquired by the company pursuant to this section shall be cancelled and, if they are shares of a surviving company, they shall be available for re-issue."*

81.    These two subsections do appear to proceed on the footing, first, that the rights of dissenting shareholders are only lost upon the giving of notice of dissent under subsection (5) and, second, that it is pursuant to the giving of a notice of dissent that the majority acquires the dissenters' shares. However, on the Company's construction of section 238, a dissenting shareholder in a



short-form merger can never give effective notice of dissent (and indeed is not required to do so) because such a shareholder is unable to exercise any dissent right to be paid fair value under section 238. If that is right, it raises the question: by what statutory mechanism is such shareholders' shareholding forfeit to the Company, and by what mechanism does such dissenter surrender their rights as a shareholder? There would appear - as Mr Adkin submits and I agree - to be no coherent answer to this question on the Company's construction of section 238.

82.     Furthermore, as cited above, section 239 of the Act sets out various provisions which limit the rights of dissenters, under the heading *"Limitation on rights of dissenters."* Subsection 239(1) provides, in summary, that dissenter rights under section 238 shall not be available in respect of shares listed on a recognised stock exchange where the minority shareholders are offered shares in the surviving or consolidated company. Significantly, subsection 239(1) does not seek to exclude from the scope of section 238 minority shareholders who dissent from a short-form merger and so also limits their recourse to redeeming the value of their shares on the relevant stock exchange. Why then, it may be asked rhetorically, would they be otherwise excluded from the scope of section 238 in the case of an unlisted company?

83.     Significantly in this regard, the Act used to contain a subsection 239(2) until it was repealed by the Companies (Amendment) (No. 2) Act, 2018. Subsection 239(2) provided that *"[r]ights under section 238 shall be available in respect of any class of shares of a constituent company if the holders thereof are required by the terms of a plan of merger or consolidation pursuant to section 233 or 237 to accept for such shares anything except"* and then stipulated a number of things, which included no



limitation in relation to dissenters under a short-form merger. The breadth of this subsection appeared to indicate that any form of shareholder of any class of shares was entitled to take advantage, upon dissenting, of the appraisal rights under section 238. That is the opposite of the construction of that section for which the Company contends.

84. Although subsection 239(2) was repealed, here I indicate my agreement with Mr Adkin that it is important to note the reasoning given for such repeal when introduced to Parliament. Hansards' Report (2018/19 [15] at page 50) that Parliament was informed that the relevant part of the Bill *"amends section 239 of the principal Law to delete subsection 2 of that section which is now considered to be an obsolete provision."* In other words, subsection 239(2) was deleted because it was considered obsolete, not because it was intended to change the substantive effect of the legislation. The position, therefore, is that section 239(2) prior to its repeal indicated that appraisal rights under section 238 were available to any form of shareholder of any class of shares, and that, it may be inferred, in repealing it Parliament considered that it was simply unnecessary for that to be spelled out in a separate provision in light of the continuing provisions of the Act.

## The broader legislative context

85. Part XVI was introduced into the Act by the Companies Act (Amendment) Bill 2009. The bill was introduced to Parliament on the following footing, as recorded in the Hansards' Report 2008/09 [3] at page 1050:

> *"[t]his bill responds to requests from the private sector in relation to merger and consolidation provisions and reflects extensive consultation with the private sector as well as the review of Bermuda, BVI, Delaware and UK legislative precedents."*



86.     In view of the reference to the legislative precedents in Bermuda, the British Virgin Islands ("**BVI**"), Delaware and the UK, I accept that it is instructive to consider the position in those jurisdictions when approaching the question raised by the Preliminary Issue in this case.

## The United Kingdom

87.     As Lady Arden noted in **_Shanda Games_**, the U.K. Companies Act 2006 does not have any direct equivalent to the merger and consolidation regime set out in Part XVI of the Act, and does not therefore have an equivalent to section 238. The closest comparable to short-form mergers is the squeeze-out provision, which also has a direct equivalent in the Act at section 88 as discussed above. As also discussed above, the approach of the English Courts to the operation of the squeeze-out provision is counter-indicative to the manner in which the Company contends the appraisal regime should work in short-form mergers under Part XVI of the Act.

## Bermuda

88. Bermuda's Companies Act 1981 ("**the Bermuda Act**") contains provisions about arrangements, reconstructions, amalgamations and mergers at Part VII. There are three provisions of relevance here.

(i)     First, section 103 sets out a 'squeeze-out' provision whereby the holders of at least 95% of the shares of a company may give notice to the remaining shareholders of an intention to acquire their shares on the terms set out in the notice. Importantly, subsection 103(2) gives the minority shareholders the right to apply to the Court to appraise the value of the shares to be purchased from him.

(ii)    Second, sections 104 and 104H of the Bermuda Act permit companies to amalgamate or merge and acquire the shares of dissenting minority shareholders. Subsection 106(4A) requires a vote in favour of a three-



fourths majority of those voting, and so is roughly similar in this regard to subsection 233(6)(a) of the Act. Importantly, subsection 106(6) makes clear that any shareholder who did not vote in favour of the amalgamation or merger and who is not satisfied that he has been offered fair value for his shares, may apply to court to appraise the fair value of his shares.

(iii)  Third, there is a provision for a short-form amalgamation or merger at section 107 of the Bermuda Act. That allows a holding company and one or more of its wholly-owned subsidiary companies to amalgamate or merge without shareholder approval. That, of course, is very different from an amalgamation or merger between a parent and subsidiary which is not wholly-owned, and where there are therefore no minority shareholders who may dissent.

89.  The upshot is that under Bermuda law where minority shareholders are made subject to the compulsory acquisition of their shares, either by means of a 'squeeze-out' or by means of an amalgamation or merger, they are entitled to be paid the fair value of their shares and for such fair value to be appraised by the Court.

90.  It is perhaps worth noting in passing, from the material provided by counsel, that the statutory regime in Canada for short-form mergers is similar to that in Bermuda: short-form mergers are permitted and do not confer dissent rights, but they can only be undertaken where the subsidiary to be merged is wholly-owned by the parent company or companies with which it is merging: see the Canada Business Corporations Act section 184. In other mergers, dissent rights appear to apply under the Canadian legislation.

**BVI**

91.  The BVI Business Companies Act 2004 (the "**BVI Act**") contains a set of



provisions at Part XI which allow mergers. Section 179(1) confers on any member of a company the right to be paid the fair value of his shares upon dissenting from a merger. Subsection 172(1) permits short-form mergers between parents and subsidiaries without a vote, where the parent holds 90% of the outstanding shares in the subsidiary. However, subsection 179(5) of the BVI Act expressly provides that a minority shareholder may dissent from such a merger, thereby obtaining appraisal rights under subsection 179(9) before a panel of appraisers.

92.   The position in the BVI, therefore, is that whilst short-form mergers between a 90% shareholding parent and its subsidiary without a vote are permitted, dissenting minority shareholders in such a merger have the express right to be paid fair value for their shares upon appraisal by a panel of appraisers.

**Delaware**

93.   The Delaware General Corporation Law (the "**Delaware Law**") appears to allow for short-form mergers at section 253, where a parent company owns at least 90% of the voting stock of a subsidiary corporation. To effect a short-form merger, the board of the parent company need only pass a resolution merging the subsidiary into the parent, or vice-versa, and file that resolution with the Delaware Secretary of State. The subsidiary corporation and its shareholders have no say in approving the merger. However, subsection 253(d) and subsection 262(b)(3) of the Delaware Law make clear that minority shareholders in the subsidiary shall have appraisal rights before the Court of Chancery in the event of such a merger.

94.   The position in Delaware, therefore, seems to be that minority dissenters have statutory appraisal rights in relation to their shareholding in short-form mergers.



## Summary

95.     It appears from the foregoing review of the four legislative regimes referred
        to upon the introduction into Parliament of Part XVI of the Act that, if the
        Company's construction of section 238 is correct, the Cayman statutory
        regime would be an outlier. There is no direct equivalent of a short-form
        merger in England but, as the decision in ***Re Bugle Press*** referred to above
        makes plain, English law will not allow squeeze-out provisions to be used to
        enable a 90% majority to deprive a minority of their shares at will and on
        whatever terms they see fit. In each of Bermuda, the BVI and Delaware,
        there are comparable merger regimes and in none of them is a dissenting
        minority able to be deprived of the right to be paid fair value for their shares:
        an appraisal right is expressly conferred under each regime, even where
        mergers are permitted without a vote because a parent holds a 90% or
        greater majority of the voting shares in a subsidiary.

96.     Given that legislative background[14], I accept that it would be very surprising
        if Parliament had intended, without expressly saying so, that the Cayman
        Islands be, as amongst its competing jurisdictions, an international outlier in
        which a shareholder which obtains a 90% majority of shares in another
        company could do so without the minority having a right of appraisal of the
        fair value of its shares. This also, I accept, tells heavily against the
        construction of section 238 contended for by the Company.

---

[14] Which I regard as relevant for consideration here given the specific reference to the comparative legislation upon
the introduction of the Bill, despite the Court of Appeal's and Privy Council's rejection of statements made during
the debate for the passage of the legislation as reported in Hansards, in the latter context, per Lady Arden: "*For my
part, I do not think that the statement made in the Legislative Assembly [(as it was then known)] provides any
assistance in the interpretation of section 238. The jurisdictions said to have been reviewed do not necessarily
provide consistent answers to the problems capable of arising from an appraisal regime, and in the case of minority
discounts they provide different answers.*" Here, antithetically, the jurisdictions said to have been reviewed, do
provide a consistent picture of the Act as an incongruous outlier if construed as failing to provide specifically for
minority appraisal rights. Specifically as regards Delaware law, I did not regard taking it at face value (ie. without
expert evidence) for purposes of this comparative exercise, as exceptionable.



## The Petitioners' constitutional argument

97.    I return here to deal with this now in detail. Section 15 of the Constitutional Bill of Rights provides as follows:

> "15 (1) *Government shall not interfere in the peaceful enjoyment of any person's property and shall not compulsorily take possession of any person's property, or compulsorily acquire an interest in or right over any person's property of any description, except in accordance with law and where—*
>
> (a) *the interference, taking of possession or acquisition is necessary or expedient in the interests of defence, public safety, public order, public morality, public health, town and country planning or the development or utilisation of any property in such manner as to promote the public benefit or the economic well-being of the community; and*
>
> (b) *there is reasonable justification for the causing of any hardship that may result to any person having an interest in or right over the property; and*
>
> (c) *provision is made by a law applicable to that interference, taking of possession or acquisition—*
>
>   (i) *for the prompt payment of adequate compensation; and*
>
>   (ii) *securing to any person having an interest in or right over the property a right of access to the Grand Court, whether direct or on appeal from any other authority, for the determination of his or her interest or right, the legality of the interference with, taking of possession or acquisition of the property, interest or right, and the amount of any compensation to which he or she is entitled, and for the purpose of obtaining prompt payment of that compensation; and*
>
>   (iii) *giving to any party to proceedings in the Grand Court relating to such a claim the same rights of appeal as are accorded generally to parties to civil*



> *proceedings in that Court sitting as a court of original jurisdiction."*

98.  Subsections 15(2) and (3) set out a number of caveats to this right of compensation (if necessary as appraised by the Grand Court), none of which is presently relevant.

99.  However, section 1(3) provides that *"[i]n this Part 'government' shall include public officials ... and Parliament, but shall not include the courts ...".*

100.  It follows, submits Mr Adkin, that in enacting and re-enacting legislation, Parliament is required to comply with the obligations imposed on government by section 15.

101.  By subsection 15(1) of the Bill of Rights, government (which includes Parliament) *"shall not interfere in the peaceful enjoyment of any person's property"* except in accordance with law and where one of the conditions set out in section 15(1)(a) to (c) applies, subject only to the caveats in subsections 15(2) and (3). It follows further, says Mr Adkin, that enacting legislation whereby minority shareholders could be compulsorily deprived of their property, without any legal recourse, would constitute such interference by Parliament and would therefore be a breach of section 15, unless permitted under subsections 15(1) to (3).

102.  Further goes the argument, whilst it can be said that the compulsory acquisition of a minority's shares under a short-form merger so as to permit the merger of a parent and subsidiary company is expedient to promote the economic well-being of the community with reasonable justification, and that it is therefore permitted under subsection 15(1)(a), it is only permissible if the conditions of subsection 15(1)(c) are met. As set out above, they require that provision is made by law for the prompt payment of adequate



compensation and securing the right of access to the owner to the Grand Court, to determine the amount of compensation. That is precisely what the Petitioners contend subsection 238(1) confers on dissenting shareholders in a short-form merger. However, the Company's contention is that they have no such rights. If that were correct, the enactment and operation of the short-form merger provisions at subsection 233(7) would, it is submitted by Mr Adkin, constitute a breach of section 15 of the Bill of Rights.

103. While I regard this to be a plausible argument, there is a more direct answer to the question of the constitutionality of subsection 233(7) and section 238 of the Act arising from the Preliminary Issue, as I now turn to discuss.

104. In this regard it is submitted that section 25 of the Constitution must be brought to bear upon the construction of section 238. Section 25 provides:

"***Interpretive Obligation***

*In any case where the compatibility of primary or subordinate legislation with the Bill of Rights is unclear or ambiguous, such legislation must, so far as it is possible to do so, be read and given effect in a way which is compatible with the rights set out in this Part.*"

105. The Petitioners' argument is that pursuant to section 25 of the Constitution, unless the legislation clearly and unambiguously holds the meaning for which the Company contends, the Court should endeavour to construe it in a way which is compatible with section 15 rights. That, the Petitioners submit, would require the Court to conclude that they are correct in their construction of section 238. For the reasons already submitted above, the Act, says Mr Adkin, plainly does not clearly and unambiguously hold the meaning for which the Company contends. It does not expressly preclude dissenter rights upon a short-form merger. It should therefore be construed



in the manner contended for by the Petitioners, so as to give effect to the constitutional section 15 rights, in accordance with section 25.

106. There is local case law which explains this process of construction or "reading down". As was explained in ***In re Nairne*** (above, at [22])[15]

*"this section [s.25] ensures that the court will strive to align an impugned legislative provision with what the legislature may reasonably be taken to have intended and, by this process of 'reading down', will seek to avoid a formal declaration of incompatibility, but the obligation imposed by s. 25 arises only in 'unclear or ambiguous' cases. Since the section appears in the Bill of Rights, it has the effect of elevating both the rule of construction itself and the limitation upon it to constitutional status. Clear cases of incompatibility are to be left to the legislature for correction."*

107. However, as was further explained by the Privy Council in ***de Freitas v Agric. Ministry Perm. Secy***. [1999] 1 A.C. 69, at 79:

*"an enactment construed by severing, reading down or making implications into what the legislature has actually said should take a form which it could reasonably be supposed that Parliament intended to enact."*

108. The Company, by Mr Potts, refutes the Petitioners' arguments based on sections 15 and 25 of the Constitution.

109. His first point of rebuttal cites section 23 of the Constitution which, in relevant part provides:

***Declaration of Incompatibility***

*(1) If in any legal proceedings primary legislation is found to be incompatible with this Part, the Court must make a declaration recording that the legislation is incompatible with the relevant section or sections of the Bill of Rights and the nature of that incompatibility ...*

...

---

[15] Later cited with approval in ***In re Borden*** 2013 (2) CILR 444 at [6]



*(3) In the event of a declaration of incompatibility made under subsection (1), **the Legislature shall decide how to remedy the incompatibility**".* [emphasis added]

110. Mr Potts submits, for the avoidance of doubt, that the Company's analysis of section 233(7) and section 238 of the Act is *clearly and unambiguously* compatible with section 15 of the Bill of Rights, with the consequence that neither sections 25 nor 23 of the Constitution are engaged.

111. As to section 15(1) of the Bill of Rights, Mr Potts emphasised that:

   (a) the Petitioners apparently concede (as discussed above) that government (including Parliament) *can* legislate by section 233(7) of the Act in such a way as to potentially interfere with the '*peaceful enjoyment of property*' where the interference is expedient to promote the public benefit or the economic well-being of the community (section 15(1)(a)), and there is reasonable justification for the causing of any hardship (section 15(1)(b)); but

   (b) the Petitioners argue that section 15(1)(c) requires that "*provision is made by a law applicable to that interference ... for the prompt payment of adequate compensation; ... and a right of access to the Grand Court*".

112. He also submits, as earlier outlined above, that minority shareholders that are the subject of a section 233(7) 'short-form' merger do, as a matter of law, have the right to prompt payment of the merger consideration (being adequate compensation provided for by the Plan of Merger pursuant to section 233(3), section 233(4)(e), and section 233(5)) as well as a right of access to the Court (albeit not under section 238), with the consequence that section 15(1)(c) is fully satisfied (assuming, but without accepting, that



section 15(1) is potentially engaged[16]). There is, however, he submits, no requirement that section 15(1)(c) be satisfied in the case of a 'short-form' merger under section 233(7) by the additional grant of a statutory right to have the Court determine the fair value of the minority shares, of the sort contemplated by section 238 (subject to its own exceptions, including section 239) in the case of a 'long-form' merger. In this respect, submits Mr Potts, section 233(7) is entirely consistent with sections 86, 87, and 88 of the Companies Act.

113. Further or alternatively (and more importantly) says Mr Potts, the Company submits that the Petitioners' analysis of section 15 is flawed in any event. This, it is said, is because the Petitioners have overlooked section 15(2)(a)(iii) of the Constitution.

114. Section 15(2)(a)(iii) expressly provides that *"Nothing in any law or done under its authority shall be held to contravene subsection (1) – (a) to the extent that the law in question makes provision for the interference with … any property, interest or right – (iii)* ***as an incident of a … contract***". [emphasis added].

115. To the extent that the 'short-form' merger provisions of section 233(7) might potentially be alleged to interfere with a minority shareholder's rights within the meaning of Article 15(1) (which is denied, given the payment of the merger consideration, the right of access to a Court by methods other than a section 238 petition, and the fact that shares are acquired subject to the provisions of the Companies Act and the Company's Articles of Association), it is clear that they do so as ***an incident of a contract*** within

---

[16] The Company does not accept that Article 15 is engaged in circumstances where the Government itself is not compulsorily taking possession of any property, and the Government is not *interfering* in the peaceful enjoyment of any property that might be held by the Petitioners (since the Petitioners' shares were acquired and held subject to the terms of the Companies Act and the Articles of Association, and any amendments thereto).



the meaning of Article 15(2)(a)(iii). In this respect says Mr Potts, the Petitioners have effectively conceded (and they certainly make no effort to discharge the burden of challenging) the proposition that the 'short-form' merger provisions are '*reasonably justifiable in a democratic society*' within the meaning of section 15(1)(b).

116.  Over and above section 233 itself, this point can be demonstrated, says Mr Potts, as follows:

(a)     Section 25(3) of the Act makes clear that the Articles of Association give rise to a statutory contract between the members, and between the Company and its members[17];

(b)     The Agreement and Plan of Merger is also a contract (which contractually binds minority shareholders such as the Petitioners, once approved and authorized by the Company). Section 233(3) of the Act expressly provides that the directors of each constituent company shall approve a written Plan of Merger; section 233(4)(e) and section 233(5) expressly provide that the written Plan of Merger shall give particulars of the terms and conditions of the proposed merger, including "*the manner and basis of converting shares ... into other property*" (including money or other property); and section 233(6)(b) and section 233(7) expressly empower the directors of each constituent company to authorize the Plan of Merger without the need for special resolutions of members;

(c)     Section 33(1) of the Act provides that a share in a company is "*personal estate and not of the nature of real estate*" which is

---

[17] In *Pearson v Primeo Fund (Cayman Islands)* [2017] UKPC 19, Lord Mance acknowledged, in the share redemption context, at paragraph 15 that "*the articles ... constitute the relevant agreement between all the members and the Company ... That is a clear indication of the freedom that shareholders and a company have to shape their relationship as regards redemption or purchase of the company's shares*".



"*capable of being transferred if (i) a transfer is expressly or impliedly permitted by the regulations of the company; and (ii) any restriction or condition on the transfer of the shares ... set out in the regulations of the company is observed*"[18]; and

(d)     Section 37 of the Act empowers a company to redeem or purchase its own shares, including at the company's option[19].

117.   Mr Potts further submits that the Company's analysis is also consistent with case law from other jurisdictions:

(a)     in ***Bramelid and Malmstrom v Sweden*** (1983) 5 EHRR 249, the European Commission of Human Rights decided that the application of compulsory minority shareholder squeeze-out legislation in Sweden (in a form similar to section 429 of the UK's Companies Act 1985) did not breach Article 1 of Protocol 1 of the European Convention on Human Rights ("**ECHR**")[20]. The Commission noted that all states party to the ECHR had laws governing private law relations which contained provisions determining the effects of those legal relations and, in certain cases, obliged one person to surrender property to another. The Commission found that the compulsory acquisition provisions did not amount to an excessive imbalance to the point of

---

[18] In other words, a share is a 'chose in action', the rights attaching to which are subject to the contractual terms of the Articles of Association, the Companies Act, and any written Plan of Merger that is approved and authorised.

[19] The Company's Articles of Association expressly provide, by Article 13, for the redemption or purchase by the Company of its shares, at the Company's option: see, for example, Article 13(b): "*Subject to the provisions of the Statute and the Memorandum of Association, the Company may purchase its own shares ... including any redeemable shares, provided that the form of any agreement, the identity of any Member, and the terms of purchase are such as prescribed by the Directors in their complete and unfettered discretion...*".

[20] Article 1 of Protocol 1 of the European Convention on Human Rights states that '*Every natural or legal person is entitled to the peaceful enjoyment of his possessions. No one shall be deprived of his possessions except in the public interest and subject to the conditions provided for by law and by the general principles of international law. The preceding provisions shall not, however, in any way impair the right of a State to enforce such laws as it deems necessary to control the use of property in accordance with the general interest or to secure the payment of taxes or other contributions or penalties'*.



breaching minority shareholders' rights to peaceful enjoyment of their shares;

(b) in **Re Hawk Insurance Co Ltd** [2001] BCC 57, the Article 6 elements of the **Bramelid** case[21] were subsequently considered, from an English law perspective, at page 77A-G. Mrs. Justice Arden, as she then was, rejected an argument that a creditors' Scheme of Arrangement might interfere with the human rights of an objecting creditor, taking into account the provisions of the UK's Human Rights Act 1998;

(c) in **Re Equitable Life Assurance Society** [2002] BCC 319, at 348B-C , Lloyd J rejected a challenge by a minority creditor to a Scheme of Arrangement under Article 1 of Protocol 1 of the ECHR: "*it seems to me plain that, given the terms of section 425 and the case law that has been established concerning its application, there is no possible argument for saying that the approval of a scheme under section 425, so as to bind dissentients among the relevant classes, breaches the rights afforded by Article 1 of the First Protocol*"; and

(d) in **Re Waste Recycling Group plc** [2004] BCC 328, Lloyd J also rejected a minority shareholder's challenge to a Scheme of Arrangement under Article 1 of Protocol 1 of the ECHR.

118. It is convenient to pause here to express my views on this argument based upon the articles as binding contract. I see the immediately foregoing case law as good for the proposition that shareholders will not be allowed to challenge a squeeze-out or scheme of arrangement to which they are bound by contract to comply per the articles of association, on Article 1 ECHR (section 15 Bill of Rights) grounds. That however, is far from support for a proposition that shareholders whose shares are compulsorily acquired under

---

[21] See (1986) 8 EHRR CD 116.



a short-form merger may not complain because that merger is allowed under the relevant articles of association. Certainly, in the present case, there has been no suggestion that the articles would allow for compulsory acquisition of the minorities' shares without fair compensation whether as appraised by the court or otherwise and the question therefore remains to be answered, by what means is that to be appraised – under section 238 or some other means?

119. Mr Potts made yet further submissions in relation to the Bill of Rights as follows. If, in its judgment, this Court were to reject the Company's primary submissions that a 'short-form' merger under section 233(7) is clearly and unambiguously compatible with section 15, he submits, in the alternative and without prejudice to his primary position, that the Court could only make a declaration of incompatibility under section 23 (on notice to the Attorney General)[22].

120. That is because (a) the interpretive obligation under section 25 only arises where the legislation is unclear or ambiguous (which, he submits, is not the position in this case, given the clear and unambiguous wording of sections 232, 233(7), and 238), and (b) it would be necessary for Parliament (rather than the Court) to decide how to remedy any incompatibility, taking into account relevant policy considerations and the need for industry consultation and an appropriate transitional period.

---

[22] The Court's attention was drawn, in this context, to *In re Nairne* (above) at paragraphs 22 and 46, and GCR Order 77A, rule 3, which provides that "*In any proceedings where there is no claim for a declaration that primary legislation, or any part thereof, is incompatible with a section or sections of the Bill of Rights, but the Court considers that the proceedings may necessarily raise a real question as to whether primary legislation, or any part thereof, is compatible with a section or sections of the Bill of Rights, then the Court shall convene a hearing to determine whether or not the Attorney General should be given notice of the proceedings and generally for the future conduct of the proceedings*".



121. In particular, it would be up to Parliament to decide whether the most appropriate remedy, in light of a declaration of incompatibility, might require:

    (a)    an amendment to the definition of "*parent company*" in section 232 (so as to limit, for example, the availability of 'short-form' mergers to wholly owned subsidiaries only); or

    (b)    a deletion of subsection 233(7) (so as to remove, for example, the ability of group companies to conduct 'short-form' mergers without special resolutions of members); or

    (c)    amendments to section 238 so as to make, for example, section 238 expressly applicable to 'short-form' mergers; or

    (d)    the adoption of a statutory mechanism for some other sort of Court application in the case of a 'short-form' merger, one potential example of which might be the sort of application provided under section 88 (i.e. an application for an order that the Court disallows the merger taking place on a 'short-form' basis or at all), but not necessarily a Court application of the sort provided under section 238 in the case of a 'long-form' merger.

122. I note here that while the constitutional arguments and counter-arguments are all skillfully presented, that aspect which I find most compelling arises from the interpretative obligation of section 25. This mandates a construction of subsection 233(7) and section 238 of the Act - to the extent that they are unclear or ambiguous - which is compatible with the rights guaranteed by the Bill of Rights. This construction, by way of "reading down", as discussed above, (by reference to *In re Nairne* and *In re Borden* both following and applying *de Frietas v Ministry of Agriculture* (also above)) will be developed in my analysis below.



123. Here I note that the difficulty of construction presented is, indeed, one which in my view, arises from lack of clarity or ambiguity as to their meaning, as between the provisions of subsection 233(7) and section 238 of the Act. If resolved by reading down the relevant provisions of sections 233 and 238 of the Act so as to make them comply with subsection 15(1) of the Bill of Rights, this would not in my view, result in the mischief of *"wholesale reading down"* which may result in the provisions of the Act *"bearing little resemblance to the law that Parliament passed"*, a circumstance which would, instead of indicating the suitability of reading down, give rise to the inference that the Act is simply incompatible and should be so declared, leaving it to Parliament to bring it into line with the constitutional guarantees of the Bill of Rights. This was as indeed advised by the Privy Council in *de Freitas v Ministry of Agriculture* (above, at [79] to [80])[23].

## Analysis and conclusions

124. It must be recognised that the Company's contention is one which would preclude the Petitioners from access to the provisions of section 238 of the Act, only because of an apparent mismatch between the mechanical provisions of that section, with the right of appraisal by the court given by section 238 itself and for which the Petitioners contend. The Company's case as to the construction of subsection 238(1), and the limitation which it contends applies to that provision so as to exclude those dissenting from short-form mergers from its scope, is derived from the subsequent provisions in subsections 238(2) to (16) which are clearly concerned with the mechanics or procedure by which a dissenting shareholder can seek to obtain fair value for their shares.

---

[23] And as applied also in *In re Nairne* and *In re Borden* (both above, ibid).



125. In particular, through Mr Potts, the Company relies on the following provisions repeated here for convenience [emphases added]:

"(1)   A member of a constituent company incorporated under this Law shall be entitled to payment of the fair value of that person's share <u>upon dissenting from a merger or consolidation</u>.

(2)    A member who desires to exercise that person's entitlement under subsection (1) shall give to the constituent company, <u>before the vote on the merger or consolidation</u>, written objection to the action.

(3)    An objection under subsection (2) shall include a statement that the member proposes to demand payment for that person's shares if the merger or consolidation is authorised <u>by the vote</u>.

(4)    Within twenty days immediately following <u>the date on which the vote of members giving authorisation for the merger or consolidation is made</u>, the constituent company shall <u>give written notice of the authorisation to each member who made a written objection.</u>

(5)    A member who elects to dissent shall, within twenty days immediately following the date on which the notice referred to in subsection (4) is given, <u>give to the constituent company a written notice of that person's decision to dissent</u>, stating - (a) his name and address; (b) the number and classes of shares in respect of which he that person dissents; and (c) a demand for payment of the fair value of that person's shares."



126. In sum, the Company relies on the underlined passages to argue that the appraisal rights provided by subsection 238(1) can only be exercised by shareholders who dissent from a merger or consolidation under subsection 233(6)(a), in which there is a vote and, since there is no vote required for authorisation of a short-form merger to be given under subsection 233(7), the Company's argument is that shareholders who dissent from such a merger have no appraisal rights under section 238.

127. The unattractiveness of that argument, I agree with Mr Adkin, is that it elevates the procedural or mechanical provisions contained in subsections 238(2) to (16), for the access to and conduct of an appraisal, to the status of substantive provisions which, at least potentially, cut down the scope of the substantive right to fair value appraisal conferred by subsection 238(1); which rights are given as subsection 238(1) states expressly, to every member who dissents. I accept that this is clearly not what subsections 238(2) to (16) were intended by Parliament to do.

128. Moreover, insofar as is necessary, these provisions can, in my view by reading down, be fairly construed so as to allow the appraisal process to operate properly in the absence of any vote under subsection 233(6) authorising a plan of merger.

129. There are various ways in which this could be achieved, perhaps the tidiest of which would simply be to read subsection 238(1), in the case of a short-form merger, as allowing a notice of dissent to be given although there is no need for a vote. In that event, the dissent would not be from the merger itself but only insofar as it would result in the acquisition of the shares of the minority for the stipulated merger price. The notice of dissent, being but a procedural requirement, instead of being given within 20 days of the date of receipt of notice that the merger has been authorized by the vote in the case



of a long-form merger (per subsection 238(4)), would be required to be given within 20 days of the copy of the plan of merger being given to the member as required by subsection 233(7). Thus, the effect of notice of dissent being given in the case of a short-form merger, would be the engagement of the section 238 process, per subsection 238(5), for appraisal of fair value by the court.

130.  Moreover, and of crucial importance to the efficacy of the acquisition of dissenting minorities' shares, and so of the short-form merger itself, subsection 238(7) becomes engaged where it provides that "*Upon the giving of a notice of dissent under subsection (5), the member to whom the notice relates shall cease to have any of the rights of a member except the right to be paid the fair value of that person's shares*" and the rights referred to in subsections (12) and (16) [emphasis added])

131.  Such a free-standing right of dissent in short-form mergers would in no way interfere with the statutory scheme for appraisal by the court in the case of long-form mergers which flow from those procedural provisions which envisage an actual vote from which dissention may arise. "Reading down" in the foregoing sense, would mean that section 238 is construed so as not to deny a minority in a short-form merger of the right to appraisal of fair value by the court, as such denial would otherwise result from reading subsection 238(1) as inextricably linked, even in the case of a short-form merger, to the other procedural provisions of the section.

132.  On the other hand, absent such a reading down, I am compelled to agree with Mr Adkin that it would be difficult to see, in light of subsection 238(7) (which, by virtue of the giving of notice of dissent brings cessation to the rights of a dissenting member), how the shares of a dissenting minority could ever be effectively acquired under a short-form merger. This is so



because subsection 238(7) makes no exception for a short-form merger. Indeed, it makes no reference to subsection 233(7) at all, and it would be absurd to conclude that a minority shareholder dissenting from the price for his shares offered under a long-form merger would have a right of fair value appraisal while a minority shareholder dissenting from the price offered for his shares in a short-form merger, would not.

133. Alternatively, as Mr Adkin submits, recognizing the absurdity of the denial of a fair value appraisal, and relying upon the principle from ***Inco Europe*** (above), the words "*if any*" could be read into subsection 238(2) after the words *"before the vote on the merger or consolidation"*. That would mean that, if there was no vote (because what was involved was a short-form merger) there would be no requirement to give notice of objection under subsection 238(2).

134. In addition, the words *"or other step"* could be read into subsection 238(4) after the words *"vote of members"*. In a short-form merger, the step giving authorisation for the merger as set out in subsection 233(7) is the giving of a copy of the plan of merger to every member of each subsidiary company to be merged, rather than a special resolution of members. That is the equivalent step in a short-form merger to the taking of the vote in a merger under subsection 233(6)(a) and it is logical that the procedure should involve the giving of notice of authorisation by the relevant company at the same time. In the present case, this was done by the Company on 13 April 2020, by which time the Petitioners had already, at least purportedly, dissented from the Merger.

135. Reading these few words into the legislation as Mr Adkin submits, would enable the procedural mechanism, set out in subsections 238(2) to (16), to

280121 Changyou.com Limited FSD 120 of 2020 Judgment

Page **60** of **71**



operate in relation to short-form mergers in the same way as long-form mergers under subsection 233(6).

136. I accept that in circumstances where it is quite clear, for the reasons discussed in detail above, that the intended purpose of the Act or provision in question was to confer the right to be paid fair value on all dissenting shareholders, to the extent that by inadvertence the draftsman or legislature produced a procedure or mechanism in subsections 238(2) to (16) which overlooked one class of dissenters (namely those dissenting from a short-form merger), appropriate language to give effect to that intention may and should be read into those provisions to carry that purpose into effect, on the principle established in *Inco Europe*, as discussed above.

137. Before completing my conclusions, I must for completeness, consider the case law upon which Mr Potts relied for the proposition that an aggrieved minority shareholder in a short-form merger would have other recourse to the court to vindicate the true value of its shares, absent the right to a fair value appraisal under section 238.

138. He argued that an authoritative example of the possible available recourses can be found in the discussion of fairness between different shareholders in the Privy Council case of *Howard Smith Ltd v Ampol Petroleum Ltd* [1974] AC 821. There, Lord Wilberforce confirming on behalf of the Judicial Committee (at page 835), that even when a matter (as in that case the raising of corporate finance) is within the responsibility of directors, the court is entitled to examine the substantial purpose for which their power was exercised, and to reach a conclusion whether that purpose was proper or not. This principle was discussed and declared[24] where the question was whether the directors in the exercise of powers given by the articles to issue new

---

[24] At page 835 C-H



shares, had used that power primarily in order to raise new capital (as they contended) or to reduce the proportionate combined shareholding of the two aggrieved shareholders in order to allow a third shareholder acquiring the newly issued shares, to achieve majority status in order to proceed with its take-over bid.

139.  This was a bid which was admittedly regarded by the directors to be more attractive than that which had been proposed by the two aggrieved shareholders.

140.  The Privy Council upheld the trial judge's conclusion, contrary to the directors' contention, holding that the latter impermissible objective was what really motivated the directors and that their decision to increase the share capital of the company by issuing the new shares, should therefore be set aside. This conclusion was reached by their Lordships even while accepting that directors in whom are vested the right and duty of deciding where the company's interests lie and how they are to be served, may be concerned with a wide range of practical considerations, and their judgment, if exercised in good faith and not for irrelevant purposes, is not open to review in the courts.[25]

141.  Lord Wilberforce, in his leading judgment, also approved of and adopted dicta from the High Court of Australia from *Mills v Mills (1938)* 60 C.L.R. 150, (per Dixon J.at 185-186), dicta which the trial judge had himself observed and applied and which explained that: "*The application of the general equitable principle [that a fiduciary power must be exercised for a proper purpose for which it is given] to the acts of directors managing the affairs of a company cannot be as nice as it is in the case of a trustee*

---

[25] Citing with approval (at 836 E) dicta to this effect from the High Court of Australia in *Harlowe's Nominee Pty. Ltd v Woodside (Lakes Entrance) Oil Co. N.L.* (1968) 121 C.I..R. at 493.



*exercising a special power of appointment*". And, equally on point here, as Dixon J had further declared[26] at first instance in ***Mills v Mills***, elaborating upon the implied limitations which the court will impose to govern decisions of directors even when taken ostensibly within their powers , in the following terms:

"*It [the court] must, as it seems to me, take the substantial object the accomplishment of which formed the real ground of the board's action. If this is within the scope of the power, then the power has been validly exercised. But if, except for some ulterior and illegitimate object, the power would not have been exercised, that which has been attempted as an ostensible exercise of the power will be void, notwithstanding that the directors may incidentally bring about a result which is within the purpose of the power and which they consider desirable.*" [27]

142. The suggestion that these principles from ***Howard Smith v Ampol*** (by which the exercise of directors' powers may be challenged successfully if done for an improper purpose) could be invoked by a disgruntled minority seeking to dissent from a short-form merger, faces obvious difficulties. Perhaps the most obvious, is that the short-form merger would be pursuant to subsection 233(7) of the Act and directors seeking simply to exercise that statutory right given their company as a 90% majority shareholder, could hardly be regarded as behaving improperly simply because they seek to do so. And so, an allegation of an improper exercise of the right for the expropriation of minority's interests, would likely come full circle to whether or not a fair

---

[26] At page 185

[27] These bases recognized by the Privy Council and High Court of Australia for challenge to directors' decisions ostensibly taken within the scope of their powers, have been more recently considered and applied by the High Court of England and Wales in *Mutual Life Ins Co of New York and Other v The Rank Organisation Ltd and Others* [1985] BCLC ChD 11, 21 J to 23 F, per Goulding J. and *Re BSB Holdings Ltd* (No 2) [1996] 1 BCLC ChD 155 at 326 to G to 329 F , per Arden J. (as she then was).



price was offered, proof to the contrary thus becoming the *sine qua non* of a successful challenge, with the burden of proof placed upon the minority, along with the concomitant risks of costs.

143. Nonetheless, says Mr Potts, it is worth noting that in at least one textbook on Cayman Islands law, the view has been expressed[28] that, even in the case of a "long-form" merger, under section 233 of the Law, a disgruntled shareholder may have the right to "*challenge the merger or consolidation on the grounds that it is void or unlawful and may have a right to bring a petition under section 92(e) [for winding up by the court on just and equitable grounds], or to bring an action for fraud on the minority*".

144. This would be *a fortiori* applicable, says Mr Potts, where the ground is expropriation of, or a fraud upon, the minority in the context of a short-form merger, precisely because there is no prescribed statutory recourse.

145. There appears to be some, if rather analogous, support for this proposition, to be found in the Privy Council decision in *CVC/Opportunity v De Marco Almeida* 2002 CILR 77, on appeal from the Cayman Islands.

146. In that case Mr Almeida, a director and minority shareholder of a company, CVC/Opportunity ("**Opportunity**"), that was the general partner of a mutual fund, petitioned for the winding up of Opportunity on the just and equitable basis. He contended, against the background described below, that a petition to wind up was the only means by which he could realize his interest in the share capital of Opportunity.

147. Following his dismissal from Opportunity, Mr Almeida had sought to realize his interest, but was told that his share was worth only the nominal issued value of S1, even though the fund under the control of Opportunity was

---

[28] By the authors of *Cayman Islands Company and Commercial Law* (Sweet and Maxwell, 2nd Ed, 2015), at [7.066] fn 75, albeit without reference to authority.



worth many millions of dollars. A shareholders' agreement prohibited the sale of the shares other than to Opportunity itself, and gave each of the minority shareholders an irrevocable put option and Opportunity the corresponding call option in respect of their shares, to be exercised in accordance with terms and conditions in a schedule to the agreement. The relevant schedule had however, been left blank.

148. In his petition, Mr Almeida alleged that under an oral agreement his single share represented a 3.5% interest in the business of Opportunity equivalent to a 3.5% beneficial interest in the share capital. Opportunity and its majority shareholder (the appellants) had obtained at first instance an interim injunction restraining Mr Almeida from presenting his petition on the basis that it was an abuse of the process of the court, Mr Almeida having, in the course of proceedings, been offered a settlement by which the appellants had offered to pay him what he would receive upon a hypothetical liquidation of Opportunity. He had declined the offer on the basis that because he had been excluded from the management, he had no confidence that the other directors would present a true statement of the value of Opportunity.

149. Mr Almeida's petition was dismissed by the Grand Court at first instance, on the basis that it was an abuse of the process of the court because he had refused the offer for purchase of his share and an order was made restraining him from re-instituting his petition.

150. Mr Almeida appealed and the Court of Appeal discharged the order restraining his petition, on the basis that a real dispute existed as to the value of his share and that the first instance judge had been in no position to assess the fairness of the offer to purchase his share. It was not sufficient simply to decide that the offer was equal to or more than the liquidation value. Both sides had to have equal access to information about the value of

Page **65** of **71**



Opportunity.

151.   On the appellants' further appeal to the Privy Council, it was held, among
other things in terms most relevant to the present discussion, that Mr
Almeida's refusal of the appellants' offer to purchase his share at liquidation
value, did not justify restraining his petition to wind up the company. The
basis for the calculation of the value of his share in the company had to be
fair to both sides. Since the appellants intended to carry on the business as a
going concern, there was no justification for adopting a liquidation value,
which would benefit the other shareholders at his expense. And that because
the business had been carried on as a joint venture, Mr Almeida's interest
could not be determined save at a price reflecting his share in the underlying
business. By analogy with a share in a true partnership, his share should be
valued on the basis of a notional sale of the business as a whole to an outside
purchaser. Nor could the restraint of the petition be justified on the basis that
it was an abuse of process. The court would not strike out proceedings
merely because a plaintiff had been offered the full amount of his claim,
although it had to ensure that a petition to wind up was not presented simply
to apply pressure to meet the petitioner's demands, where his objective
could be achieved by other means. In the case however, the winding up of
the company on the just and equitable ground was the only remedy available
to Mr Almeida (even though it would not benefit him), since there was no
provision in the Cayman Islands Companies Act enabling the court to order
the company to buy his shares. Nor could a shareholder present a petition to
protect minority shareholders against oppressive or prejudicial conduct of
the company's affairs (as could be done for instance, in the United
Kingdom). Accordingly, his petition would not be brought for an improper
purpose but instead, to obtain a just result between the parties and should be

allowed to be presented.

152. While in the present case, unlike in Opportunity, there is no alleged quasi-partnership or joint venture, Mr Potts submits that there is no reason why a petition to wind up on just on equitable grounds would not be available to the Petitioners, if genuinely aggrieved that the price offered for their shares is unfair.

153. There may be merit in this argument but it is nonetheless, debatable. The flexibility of the jurisdiction to wind up on the just and equitable basis was recognized by Lord Millet in his judgment delivered on behalf of the Judicial Committee [60]:

> "*By presenting a winding-up petition on the "just and equitable" ground, Mr DeMarco is invoking the traditional jurisdiction of equity to subject the exercise of legal rights to equitable considerations. If he can make good his contention that the business venture which the parties carried on through the medium of the company possessed the necessary characteristics, then equity will not allow Opportunity to exploit its position to make a profit at his expense. If it wants to carry on the company's business as a going concern without him, it must offer to pay him the going concern value of his interest. If it is unwilling to pay him more than the break-up value or liquidation value of his interest then the court may order that the company be wound up.*" [emphasis added]

And earlier at [16]:

> "*… The only remedy available to a minority shareholder [who claims for a fair price for his shares] is to have the company wound up. This is likely to be contrary to his own interests and proportionately more so to the interests of the majority, and it is not normally what the minority shareholder really wants. But the risk that the company may be wound up tends to concentrate minds and encourages the parties to negotiate an acceptable compromise. This usually consists of an offer by the majority to buy out the minority at an appropriate price.*"



154.  Mr Potts submits that it is clear from this dicta from **Opportunity** and the dicta from **Howard Smith v Ampol** (above), that shareholders who wish to challenge the exercise of directors' powers on the basis, such as suggested here, that a short-term merger has been misused to enable their shares to be acquired at an unfair value and so as to improperly favour the interests of the majority over their own, will have standing to challenge the exercise of the powers before the court, whether by way of petition to wind up or other process based on contractual rights under the articles of association.

155.  A logical consequence of such a challenge must also be, he submitted, that the court will have the power, not only to set aside the merger but instead to determine the fair value of the minority shareholders' shares.

156.  As regards possible reliance on the dicta from **Howard Smith v Ampol** (above), I have already identified (at [142] above), the obvious difficulties to be confronted by a minority under a short-form merger seeking appraisal of fair value. As regards possible reliance upon the principles from **Opportunity**, the words in emphasis in the passage quoted at [153] above), suggest that Lord Millet had in mind a business venture in the nature of a quasi-partnership such that the breakdown of the relationships would be the grounds for the petition to wind up. If so, a minority dissenting to a short-form merger may arguably not come within the contemplation of the **Opportunity** principle. Instead, such a minority may be regarded merely as seeking to wind up what would then be the merged entity, on the basis of a disputed debt, with the well-known difficulties confronting such a petition, in particular the prerequisite showing, at least *prima facie*, that the debt is actually owed[29].

---

[29] See for instance, in the Matter of **GFN Corporation Limited** 2009 CILR 650.



157. And so, while there may be plausible alternatives, they offer no recourse for a shareholder dissenting from a short-form merger which would be a workable equivalent to the right to fair value appraisal under section 238, which has been described by this court in ***In the Matter of JA Solar Holdings*** (above at [14] to [15]) as a "*vital safeguard for minority shareholders designed to protect their economic interests in the company sought to be acquired*" and in respect of which "*a relatively standard procedure has developed for bringing section 238 cases to trial.*"

158. By contrast with a writ action for breach of contract or petition to wind up, section 238 affords a direct right to petition for appraisal of fair value, without first having to show grounds for winding up (such as that a debt is already owed) or that the statutory process has been abused for an improper purpose in order to acquire the shares, the value of which is in question.

159. The possible availability of the alternative remedies is therefore in my view, no reason for imputing to Parliament, as Mr Potts submits implicitly, a deliberate intention to have excluded short-form mergers from the safeguard afforded by section 238; *viz*. the right of direct petition to the court for appraisal of fair value.

In summary, I conclude as follows:

- Subsection 238(1) is compendious in conferring the right to be paid fair value on any shareholder dissenting from a merger or consolidation. Ambiguity however arises from the mismatch between the compendious terms of subsection 238(1) and the subsequent provisions of section 238 when considered in the context of short-form mergers under subsection 233(7).



- Nonetheless, the subsequent provisions of section 238 describe the procedure by which a member may apply to the court for the appraisal of fair value without exclusion of short-form mergers.

- It would be absurd to exclude a dissentient member of a company subject to a short-form merger from the protection of section 238 simply because, unlike in the case of a long-form merger, that member is not allowed to vote. The need for protection is no less clear and so Parliament should not be taken as having intended such a consequence absent express words to that effect.

- On the contrary, the exclusion of short-form mergers from section 238 appraisal rights, would be anomalous, having regard to the protections afforded minorities under schemes of arrangements and squeeze-outs elsewhere within the Act itself and under subsection 237(10) in the case of a merger acquisition by an overseas company.

- Instead of reading the procedural provisions of section 238 as excluding short-form mergers, they should be construed or read down, so as to allow for access to the protection of section 238 and so, to avoid any implication of minority shareholders being susceptible to having their shares compulsorily acquired at other than fair value as appraised by the court and without the need to assume the difficulties and risks of other doubtfully or not readily available recourses.

- Accordingly, I conclude that the Petitioners have taken the appropriate steps to dissent from the Merger and have the right to prosecute their petition. This is of course, without reflecting in any way, upon whether or not fair value has been paid by virtue of the assessment provided by Houlihan Lokey.



- It follows unless submissions are to be made to the contrary, that the Petitioners are entitled to their costs associated with the trial of the Preliminary Issue, to be taxed if not agreed.

Hon Anthony Smellie
Chief Justice

28 January 2021